133 Nev., Advance Opinion 31

## IN THE SUPREME COURT OF THE STATE OF NEVADA

LUIS GODOREDO PIMENTEL, III,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 68710

FILED

JUN 22 2017

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a judgment of conviction, pursuant to a jury verdict, of murder with use of a deadly weapon. Eighth Judicial District Court, Clark County; Carolyn Ellsworth, Judge.

*Affirmed.*

Philip J. Kohn, Public Defender, and William M. Waters and Howard Brooks, Deputy Public Defenders, Clark County,
for Appellant.

Adam Paul Laxalt, Attorney General, Carson City; Steven B. Wolfson, District Attorney, and Sandra DiGiacomo and Jonathan E. VanBoskerck, Chief Deputy District Attorneys, Clark County,
for Respondent.

BEFORE THE COURT EN BANC.

*OPINION*

By the Court, CHERRY, C.J.:

Appellant Luis Pimentel appeals his conviction of first-degree murder. Pimentel and Robert Holland had been shouting at each other throughout the evening, mostly regarding a mutual female friend, before Holland arrived at Pimentel's home to confront him. During the fight,

17-20698

Pimentel shot Holland twice, including once after Holland had already collapsed from the first shot. Holland died from his wounds.

NRS 200.450 provides that if any "person, upon previous concert and agreement, fights with any other person" and "[s]hould death ensue to [the other] person in such a fight," the surviving fighter is guilty of first-degree murder. Pimentel argues that NRS 200.450 is void because it is both unconstitutionally vague and overbroad. We hold that NRS 200.450 is not vague because it provides a person of ordinary intelligence fair notice of what conduct is prohibited and because it sets forth clear standards that prevent arbitrary enforcement. We also hold that NRS 200.450 is not overbroad because it does not criminalize protected speech, but the ensuing fight and potential resulting death.

In *Wilmeth v. State*, 96 Nev. 403, 405-06, 610 P.2d 735, 737 (1980), we held that where a challenge to fight is accepted and the decedent unilaterally escalated the fight with a deadly weapon, the survivor was not entitled to a self-defense jury instruction. Although we noted there could be some cases in which a mutual combatant could be entitled to such an instruction, the factual differences between the instant case and *Wilmeth* are not legally consequential. Therefore, the district court did not abuse its discretion by instructing the jury that although self-defense was available as a defense to first-degree murder under the traditional theory of murder, it was not available as a defense to murder under the challenge-to-fight theory.

We are also asked to consider whether the State's expert witness violated the exclusionary rule by remaining in the courtroom during other witnesses' testimony and whether she exceeded the scope of her purpose by impeaching the defendant's trial testimony with

statements he made to her during a court-ordered, independent psychological examination. Due to an insufficient record, we are unable to determine whether the expert's presence violated the exclusionary rule. Regarding her testimony, however, we hold that it was error to allow the expert witness to impeach Pimentel's testimony with statements he made at his court-ordered evaluation, but we conclude that the error does not require reversal, as it was harmless due to the fact that Pimentel's own testimony was enough, in and of itself, to support his conviction.[1]

## FACTS AND PROCEDURAL HISTORY

Holland had been in a romantic relationship with Amanda Lowe. Unbeknownst to Holland, Lowe also had a sexual relationship with Pimentel. Pimentel and Lowe were together at a casino when Holland, who found out the two were together, angrily confronted them. Casino security eventually asked Holland to leave. Holland left, and Lowe followed him outside, where Holland slapped Lowe, who then reentered the casino. Holland, who remained outside, happened upon two of his friends, Timothy Hildebrand and Shannon Salazar, in the parking lot and asked them to enter the casino to convince Lowe to come back outside to talk. Hildebrand and Salazar were unsuccessful. Holland later asked his father, who came to pick him up, to find Lowe inside the casino to convince her to talk to Holland outside. Holland's father was also unsuccessful.

Eventually, Pimentel and Lowe left the casino. Holland began arguing with them as they walked to Pimentel's hotel room on the property. Pimentel went to his room, but Lowe stayed in the parking lot

---

[1]Pimentel has raised other claims of error beyond those discussed in this opinion. We have considered each claim and have concluded that they are without merit.

to talk to Holland. Holland again struck Lowe and security intervened. Pimentel left his room and confronted Holland, and although no punches were thrown at that time, the two shouted back and forth at each other in a manner that could reasonably be interpreted as either a challenge-to-fight and as an acceptance thereof.[2]

After this altercation, Hildebrand and Salazar drove Pimentel and Lowe to Pimentel's apartment. Holland got a ride to Pimentel's apartment from his father. Once at the apartment complex, Holland punched Pimentel, initiating a fistfight. During the altercation, Pimentel shot Holland twice, including once after he had already fallen to the ground.[3] After shooting Holland, Pimentel threw the gun away. Pimentel

---

[2]The record does not indicate either which, if any, words the jury determined constituted a challenge or an acceptance. Pimentel's own testimony, however, demonstrated at least two instances where a reasonable juror might have found that he either challenged Holland or accepted Holland's challenge. One example, is when Pimentel learned that Holland struck Lowe, he shouted:

> All right, you know what, that's enough, Dude. I mean, seriously, you want to hit Aman—I mean, you want to hit a woman why don't you just come and hit a man then.

Pimentel also shouted, "[Y]ou know where I be," in response to Holland's direct threats.

[3]The parties dispute how this altercation took place. Pimentel claims that Holland pulled a firearm on him before Pimentel disarmed and shot Holland. The State claims that although Holland approached Pimentel, it was Pimentel who initially drew the firearm. Although the jury convicted Pimentel of first-degree murder, it acquitted him of possession of a concealed firearm, indicating that the jury perhaps believed Pimentel's account of these facts. For the purposes of this opinion, who brought the gun to the fight is unimportant.

fled the scene and boarded a bus. The police found Pimentel on the bus not far from the scene of the shooting and arrested him.

In its initial criminal complaint, the State charged Pimentel with murder with use of a deadly weapon under the theory that the murder was committed with malice aforethought, premeditation, and deliberation. *See* NRS 200.010. After the preliminary hearing, the State added a charge of carrying a concealed weapon, *see* NRS 202.350, and a theory of first-degree murder involving a killing as the result of a challenge to fight, *see* NRS 200.450.

Pimentel noticed Dr. Briana Boyd as an expert witness who would testify regarding post-traumatic stress disorder (PTSD). In response, the State filed a motion to compel Pimentel to submit to an independent psychological examination. The State also supplemented its notice of expert witnesses to include Dr. Melissa Piasecki, an expert in forensic psychiatry. The district court granted the State's motion and compelled Pimentel to undergo a psychological evaluation with Dr. Piasecki.

After Pimentel rested, the State called Dr. Piasecki during its rebuttal case. Dr. Piasecki had observed Lowe's, Pimentel's, and Dr. Boyd's testimony prior to taking the stand. Dr. Piasecki answered questions throughout her testimony comparing Pimentel's statements during the evaluation to his statements during trial testimony.

After the close of evidence, Pimentel objected to the district court's instruction regarding self-defense being unavailable under a challenge-to-fight theory. Although the jury acquitted Pimentel of possession of a concealed firearm, it found Pimentel guilty of first-degree murder with the use of a deadly weapon. The jury, however, was not

asked to indicate which theory of first-degree murder it used to convict. The district court subsequently entered its judgment of conviction, in which it sentenced Pimentel to 20-50 years for the murder conviction and a consecutive term of 32-144 months for the deadly weapon enhancement.

## DISCUSSION

### *NRS 200.450 is neither vague nor overbroad*

Any "person, [who] upon previous concert and agreement, fights with any other person or gives, sends or authorizes any other person to give or send a challenge verbally or in writing to fight any other person, the person giving, sending or accepting the challenge to fight any other person" is guilty of at least a gross misdemeanor under the challenge-to-fight law. NRS 200.450(1). "Should death ensue to a person in such a fight, or should a person die from any injuries received in such a fight, the person causing or having any agency in causing the death . . . is guilty of murder in the first degree . . . ." NRS 200.450(3).

Pimentel argues that NRS 200.450 is unconstitutionally vague because it fails to define its essential terms, such as "previous concert and agreement," "challenge," or "acceptance," and thus, one cannot reasonably conform his or her conduct to avoid criminal liability. He also claims that NRS 200.450's allegedly unascertainable terms allow for arbitrary enforcement. Finally, Pimentel argues that NRS 200.450 is overbroad because it can criminalize speech commonly used in trash-talking or other commonplace uses. We disagree with each claim.

We review the constitutionality of a statute de novo. *Scott v. First Judicial Dist. Court*, 131 Nev., Adv. Op. 101, 363 P.3d 1159, 1161 (2015). However, we begin with the presumption that a statute is constitutional, and the challenging party has the burden to make a "clear showing of invalidity." *State v. Castaneda*, 126 Nev. 478, 481, 245 P.3d

550, 552 (2010) (internal quotation marks omitted). Moreover, we proceed with the understanding that "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Id.* (internal quotation marks omitted).

*NRS 200.450 is not unconstitutionally vague*

"The void-for-vagueness doctrine is rooted in the Due Process Clauses of the Fifth and Fourteenth Amendments." *Carrigan v. Comm'n on Ethics*, 129 Nev. 894, 899, 313 P.3d 880, 884 (2013). "A criminal statute can be invalidated for vagueness (1) if it fails to provide a person of ordinary intelligence fair notice of what is prohibited; or (2) if it is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Scott*, 131 Nev., Adv. Op. 101, 363 P.3d at 1164 (internal quotation marks omitted). The key difference between the two tests is that the first test deals with the person whose conduct is at issue, while the second deals with those who enforce the laws, such as police officers. *Id.* The two tests are independent of one another, and failing either test renders the law unconstitutionally vague. *Castaneda*, 126 Nev. at 481-82, 245 P.3d at 553.

> By requiring notice of prohibited conduct in a statute, the first prong offers citizens the opportunity to conform their own conduct to that law. However, the second prong is more important because absent adequate guidelines, a criminal statute may permit a standardless sweep, which would allow the police, prosecutors, and juries to pursue their personal predilections.

*Silvar v. Eighth Judicial Dist. Court*, 122 Nev. 289, 293, 129 P.3d 682, 685 (2006) (internal citation and quotation marks omitted).

We have previously held that NRS 200.450 is not void for vagueness. *See Wilmeth v. State*, 96 Nev. 403, 404-05, 610 P.2d 735, 736

(1980). In the context of a fight that escalated to the use of a deadly weapon and a death, we noted:

> In the context of this case, we believe that the statute provided appellant with sufficient warning of the proscribed behavior. The statute proscribes the *conveyance or acceptance of a challenge to fight when such a fight or confrontation results.* The degrees of punishment depend upon whether the fight involves the use of a deadly weapon or results in death. *Here, there was a challenge and an acceptance, a subsequent confrontation, and the use of a deadly weapon was involved. There was also a resulting death.*

*Id.* at 405, 610 P.2d at 737 (citation omitted) (emphases added).[4]

Pimentel argues that we limited our holding in *Wilmeth* to the facts of that case.[5] This argument is unpersuasive. Even if we assume the facts of the two cases are legally distinguishable, Pimentel challenges the language of the statute itself, which is the same language that we previously held to be not vague. Although the phrase "previous concert and agreement" is not one commonly used today, when read in context, the statute should be clear to a person of ordinary intelligence that the

---

[4]Due to a printing error, a portion of the quoted language was omitted from Volume 96 of the *Nevada Reports*; the full text of the court's decision in *Wilmeth* was reproduced in the *Pacific Reporter* and is quoted here.

[5]The *Wilmeth* court did not provide much factual detail. What is known, however, is that there "was a challenge and an acceptance, a subsequent confrontation, and the use of a deadly weapon was involved. There was also a resulting death." 610 P.2d at 737. We also know that the appellant in *Wilmeth* argued that he should have been entitled to a self-defense instruction because there was no prior agreement to use weapons, but a deadly weapon was nonetheless involved. *Id.*

prohibited act is to engage in a fight after one party issues a challenge to fight and the other party issues an acceptance to that challenge.

Looking to the statute as applied to the facts of the case, Pimentel is unable to distinguish the facts of this case from those of *Wilmeth*. In this case both Pimentel and Holland shouted words, which can reasonably be construed as either a challenge or acceptance to fight, back and forth to each other. Although Holland struck Pimentel first, a fight ensued. Pimentel used a deadly weapon regardless of who initially possessed it. Finally, Holland died as a result of the fight and the use of the deadly weapon. Accordingly, we conclude that a person of reasonable intelligence would be aware that Pimentel's actions in this case constituted either a challenge to fight or an acceptance thereof, and participation in an ensuing fight. Therefore, NRS 200.450 is not vague under the first test.

Regarding the second vagueness test, NRS 200.450 would be vague "if it is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Carrigan*, 129 Nev. at 899, 313 P.3d at 884. Pimentel has put forth no evidence, nor is there anything in the record, to indicate that some fight participants would be more or less likely to be charged under NRS 200.450 than others. The police and prosecutors need only look to find evidence that the fighters agreed to fight beforehand, a fight actually took place, and in the case of murder charges, that one or more of the fighters died as a result. Accordingly, we are not persuaded that NRS 200.450 leads to arbitrary or discriminatory enforcement, and thus, it does not fail the second test. Because NRS 200.450 does not fail either vagueness test, it is not unconstitutionally vague, and we affirm the district court on this ground.

*NRS 200.450 is not unconstitutionally overbroad*

"Whether or not a statute is overbroad depends upon the extent to which it lends itself to improper application to protected conduct." *Scott v. First Judicial Dist. Court*, 131 Nev., Adv. Op. 101, 363 P.3d 1159, 1162 (2015) (quoting *N. Nev. Co. v. Menicucci*, 96 Nev. 533, 536, 611 P.2d 1068, 1069 (1980)). A law is overbroad when it has a "seemingly legitimate purpose but [is] worded so broadly that [it] also appl[ies] to" conduct protected by the First Amendment.[6] *Id.* We have held that while even "minor intrusions on First Amendment rights will trigger the overbreadth doctrine[,] . . . a statute should not be void unless it is substantially overbroad in relation to the statute's plainly legitimate sweep." *Id.* (internal quotation marks omitted).

In *Scott*, a police officer pulled over a driver for running a stop sign and suspected the driver was driving under the influence. *Scott*, 131 Nev., Adv. Op. 101, 363 P.3d at 1161. Scott, a passenger in the car, told the driver that he did not have to do anything the officer said. *Id.* The officer instructed Scott to remain silent, but Scott continued to advise the driver. *Id.* The officer arrested Scott for violating a city ordinance prohibiting interference with an officer performing his or her duties. *Id.* We concluded that the ordinance was unconstitutionally overbroad because it "encompasse[d] protected speech and [was] not narrowly

---

[6]The First Amendment, however, does not protect all types of speech, as "fighting words, or words that by their very utterance . . . tend to incite an immediate breach of the peace" are not constitutionally protected. *Scott*, 131 Nev., Adv. Op. 101, 363 P.3d at 1162 (2015) (internal quotation marks omitted); *see also Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942) (recognizing the fighting words exception to the First Amendment's freedom of speech).

tailored to prohibit only disorderly conduct or fighting words." *Scott*, 131 Nev., Adv. Op. 101, 363 P.3d at 1163 (internal quotation marks omitted); *see also Silvar v. Eighth Judicial Dist. Court*, 122 Nev. 289, 298, 129 P.3d 682, 688 (2006) (holding that county ordinance designed to punish loitering for purposes of prostitution was overbroad because it punished otherwise protected conduct that could indicate loitering for prostitution, such as engaging in a conversation or waving one's arms); *but see Ford v. State*, 127 Nev. 608, 619, 262 P.3d 1123, 1130 (2011) (holding that for an inchoate crime like solicitation, where "the crime is complete once the words are spoken with the requisite intent," the spoken words are not protected speech when attempting to convince another to engage in an unlawful act, such as prostitution).

Unlike the city ordinance in *Scott*, NRS 200.450 does not criminalize speech because without an ensuing fight there is no criminal liability. Moreover, without a resulting death, NRS 200.450(3) does not provide for first-degree murder liability. Similarly to the felony-murder rule, which provides "that the intent to commit the [underlying] felony supplies the malice for the murder," *see Nay v. State*, 123 Nev. 326, 332, 167 P.3d 430, 434 (2007), NRS 200.450 relies on a person's intent to fight to satisfy the *mens rea* requirement to prove murder. NRS 200.450, like the felony-murder rule, does not create a strict liability crime because the initial intent to fight must be found to sustain a murder charge under the challenge-to-fight theory. Because NRS 200.450 does not punish speech, but only uses speech to demonstrate *mens rea* for an ensuing fight and resulting death, it is not unconstitutionally overbroad.

*The district court properly instructed the jury regarding self-defense and its inapplicability to challenge-to-fight murder theory*

The district court instructed the jury that under the challenge-to-fight theory of murder, self-defense was not available "to someone who engages in a challenge to fight and a death results," even though Pimentel presented evidence that Holland escalated the fight by introducing a firearm.[7] Pimentel argues that the district court erred by giving that instruction because it relied upon *Wilmeth v. State*, 96 Nev. 403, 405-06, 610 P.2d 735, 737 (1980), where we did not categorically foreclose upon asserting self-defense against a challenge-to-fight charge. Pimentel does not, however, explain how his case differs from *Wilmeth* to entitle him to assert self-defense under the challenge-to-fight theory. Although we agree that self-defense might not always be unavailable as a defense to the challenge-to-fight theory of murder,[8] we conclude that it was unavailable in the instant case.

The district court has broad discretion to determine whether a jury instruction is correct and proper. NRS 175.161(3); *Crawford v. State*, 121 Nev. 744, 748, 121 P.3d 582, 585 (2005). A district court's decisions in settling jury instructions are reviewed for abuse of discretion or judicial error. *Id.* A district court abuses its discretion if its "decision is arbitrary or capricious or if it exceeds the bounds of law or reason." *Id.* (internal quotation marks omitted). Whether an instruction was an accurate

---

[7]Jury Instruction 19 read: "Under the theory of challenge to fight for First Degree Murder, the right of self defense is not available to someone who engages in a challenge to fight and a death results."

[8]We are not asked to delineate in which cases a challenge-to-fight murder defendant may assert self-defense, and we decline to do so now.

statement of the law, however, is reviewed de novo. *Funderburk v. State*, 125 Nev. 260, 263, 212 P.3d 337, 339 (2009).

We have previously held that self-defense was not available as a defense to a violation of NRS 200.450 when a defendant voluntarily places himself in a situation where he issues or accepts a challenge to fight and a fight occurs, even if the decedent unilaterally escalated the situation. *Wilmeth*, 96 Nev. at 405-06, 610 P.2d at 737. *Wilmeth* involved a case where, despite a challenge and an acceptance to engage in a fistfight, the decedent allegedly brandished a weapon with no prior agreement to use weapons, and therefore, Wilmeth felt entitled to his proffered instruction on self-defense. *Id.* Although Wilmeth was in fact given a standard self-defense instruction, we concluded that he was not entitled to it, noting that "the instructions given improperly benefitted" him. *Id.* at 407, 610 P.2d at 738.

Some foreign jurisdictions have provided exceptions to the general rule that one cannot assert self-defense when engaged in mutual combat. *See, e.g., State v. O'Bryan*, 123 A.3d 398, 408 (Conn. 2015) (holding that despite a statute precluding mutual combatants from asserting self-defense at all, an escalation exception applied because "the requisite agreement does not exist when one party unilaterally and dangerously escalates the previously equal terms of a fight"); *State v. Friday*, 306 P.3d 265, 277 (Kan. 2013) (recognizing that the rule prohibiting self-defense for mutual combat "does not destroy the right to self-defense in all mutual combat cases; but for self-defense to justify the killing, the defendant must be acting solely for the protection of the defendant's own life, and not to inflict harm upon the defendant's adversary" (internal quotation marks omitted)); *Gill v. State*, 184 S.W.

Supreme Court
of
Nevada

(O) 1947A

13

864, 864 (Tenn. 1916) (disagreeing with an instruction which held "that if one willingly entered into a mutual combat with another without any intent to do great bodily harm, and thereupon his adversary resorted to a deadly weapon and was about to assault him therewith, he would not have the right to defend himself or resort to such a weapon in his necessary self-defense").

Other jurisdictions require that the defendant attempt to stop fighting and clearly indicate that intent to the decedent. *See, e.g., People v. Nguyen*, 354 P.3d 90, 112 (Cal. 2015) ("The right of self-defense is only available to a person who engages in mutual combat if he has done all of the following: [o]ne, he has actually tried in good faith to refuse to continue fighting; two, he has clearly informed his opponent that he wants to stop fighting; three, he has clearly informed his opponent that he has stopped fighting; and, four, he had given his opponent the opportunity to stop fighting."); *see generally* 40 Am. Jur. 2d *Homicide* § 141 (2008) ("One is not justified in using force which is either intended or likely to cause death or great bodily harm if he or she is engaged in mutual combat, unless he or she withdraws and effectively communicates that to the victim.").

*Nguyen* required facts that are not present in the instant case, i.e., the defendant's intent to stop fighting and his communication of that intent to the decedent. Although the holdings from *O'Bryan*, *Friday*, and *Gill* are not entirely unpersuasive, the fact remains that we have previously held that self-defense does not apply in a challenge-to-fight murder case merely because the decedent unilaterally escalated a fistfight to one using a deadly weapon. *See Wilmeth*, 96 Nev. at 405, 610 P.2d at 737 (holding that one participant in a fight who kills the other may not

claim self-defense even if the decedent went beyond the agreed upon terms and introduced a deadly weapon). We hold no differently now. Accordingly, the district court did not abuse its discretion by instructing the jury that self-defense was unavailable under challenge-to-fight theory in this case, and we affirm the district court on this ground.

*We are unable to conclude that Dr. Piasecki's presence in the courtroom violated the exclusionary rule*

Pimentel argues that allowing Dr. Piasecki to listen to his, Dr. Boyd's, and Lowe's testimony before taking the stand violated the exclusionary rule. The State argues that Pimentel did not object to Dr. Piasecki's presence below, nor does the record indicate that he ever invoked the exclusionary rule. Because the record does not indicate that Pimentel invoked the exclusionary rule, we are unable to grant him relief on this issue.

Nevada's exclusionary rule requires, "*at the request of a party,*" all witnesses to leave the courtroom "so that they cannot hear the testimony of other witnesses." NRS 50.155(1) (emphasis added). Parties or persons whose presence is essential to the party's cause are exempted from the exclusionary rule. NRS 50.155(2).

The record lacks any indication that Pimentel invoked the exclusionary rule at trial. At oral argument, Pimentel asserted that the district court informed him, 15 minutes into trial, that it was too late to request the bench conferences to be recorded. He also indicated that because the bench conferences were not recorded, he was unsure whether trial counsel invoked the exclusionary rule. The State confirmed that this particular district court department requires parties to request recorded bench conferences prior to trial and claimed that Pimentel did not, in fact, invoke the exclusionary rule.

We have previously held that a district court commits error when it fails to record bench conferences in a criminal trial. *See Preciado v. State*, 130 Nev. 40, 43, 318 P.3d 176, 178 (2014) ("Due process requires us to extend our reasoning [requiring all bench conferences to be recorded in capital cases] to defendants in noncapital cases, because regardless of the type of case, it is crucial for a district court to memorialize all bench conferences, either contemporaneously or by allowing the attorneys to make a record afterward."). We need not reverse the conviction due to this error, however, because Pimentel has not demonstrated that the missing record is "so significant that [its] absence precludes this court from conducting a meaningful review of the alleged errors . . . *and the prejudicial effect of any error*." *See id.* (emphasis added).

At trial, Pimentel testified that he challenged Holland to hit him, rather than Lowe. Pimentel also testified that after Holland threatened him, he responded "you know where I be." As a result, Pimentel's own testimony provided enough evidence that he either challenged Holland to fight or accepted Holland's challenge to fight before they actually fought and Holland died. Therefore, any harm done by allowing Dr. Piasecki to remain in the courtroom prior to her own testimony was not prejudicial because Pimentel provided enough evidence, in and of itself, to support his conviction under the challenge-to-fight murder theory. Moreover, the totality of the admissible evidence presented was sufficient to convict Pimentel under either theory of murder. Because Pimentel both failed to demonstrate that he invoked the exclusionary rule at trial or that the missing record precluded us from reviewing the prejudicial effect of the alleged exclusionary error, we affirm the district court on those grounds.

*Dr. Piasecki's testimony impermissibly exceeded her scope as an expert witness, but the error was harmless*

Pimentel claims that Dr. Piasecki's testimony was supposed to focus on Pimentel's psychological diagnoses and how they related to Pimentel's actions on the night of the incident, but instead she compared his trial testimony with his statements made to her during the psychiatric interview. He adds that Dr. Piasecki served less as an expert and more as an unfair impeachment tool. We agree with Pimentel, but nevertheless conclude that the error is harmless.

Generally, the State may not use a healthcare provider to introduce a defendant's un-*Mirandized* statements from a court-ordered psychiatric evaluation. *Mitchell v. State*, 124 Nev. 807, 819-20, 192 P.3d 721, 729 (2008). The State may, however, introduce rebuttal evidence through a healthcare provider if it "(1) is relevant to undermining a defendant's insanity defense, and (2) does not relate to the defendant's culpability with respect to the charged crimes." *Id.* at 20, 192 P.3d at 729. Furthermore, an expert may not opine as to the ultimate question of any element of a charged offense because to do so usurps the jury's function. *Winiarz v. State*, 104 Nev. 43, 51, 752 P.2d 761, 766 (1988).

Error of this nature must be reversed unless this court can declare that it "was harmless beyond a reasonable doubt." *Id.* at 50, 752 P.2d at 766. Harmless error is "[a]ny error, defect, irregularity or variance which does not affect substantial rights." NRS 178.598.

Dr. Piasecki testified about what, if any, factor Pimentel's PTSD played on the night of the shooting and refrained from opining as to the ultimate question of any element of a charged offense, including whether Pimentel intended to fight or intended to kill. However, her testimony exceeded the allowable scope when she compared Pimentel's

SUPREME COURT
OF
NEVADA

(O) 1947A

17

prior un-*Mirandized* statements from the psychiatric evaluation with Pimentel's trial testimony. *See Winiarz*, 104 Nev. at 51, 752 P.2d at 766; *Mitchell*, 124 Nev. at 819-20, 192 P.3d at 729. Dr. Piasecki's testimony, however, was ultimately harmless beyond a reasonable doubt for the same reason that her presence in the court room during other witnesses' testimony was harmless, *i.e.* because the other evidence presented at trial, including Pimentel's own testimony, was sufficient to sustain a first-degree murder conviction under either theory of murder as charged.

## CONCLUSION

After considering all of Pimentel's claims on appeal, we conclude that there are no instances of reversible error. Accordingly, we order the judgment of conviction affirmed.

_____, C.J.
Cherry

We concur:

_____, J.
Douglas

_____, J.
Gibbons

_____, J.
Pickering

_____, J.
Hardesty

_____, J.
Parraguirre

_____, J.
Stiglich

